Wilde, J.
It was decided, in a former action between these parties, that the defendant had a right to retain the certificates in question, so far as might be necessary to secure the debt due to him from the estate of Joseph Russell; to whom he had made advances *354 on the credit of these certificates. (1) For, whatever defect there might have been in Russell’s title, the defendant, it appeared, was ignorant of it. His rights, therefore, ought not to have been prejudiced by any breach of trust on the part of Russell. The defendant having obtained the certificates fairly, and for a valuable consideration, from the lawful holder, who had an apparent title, his rights were not to be questioned by Jarvis, who, by endorsing the certificates in blank, had given them a transferable quality by delivery or cr, and had thus placed them upon the footing of negotiable paper.
But the plaintiff having, since the determination of the former action, tendered to the defendant the amount of his debt, he can no longer be considered as a holder for value ; nor can he defend himself in this action, except by showing that the executrix of Russell, or Otis in her right, has a * legal claim to the certificates, paramount to that of the plaintiff.
This action, therefore, to all substantial ends, may be considered as a suit between the plaintiff and Otis, and I shall accordingly thus consider it.
It is admitted that the certificates in question were once the property of Leonard Jarvis, the plaintiff’s intestate. The plaintiff is therefore entitled to recover their value, unless Otis can show a title derived from him.
Otis, in his own right, has no claim ; for it is not pretended that he has any title, except as agent of the executrix of Russell. Her title is founded on a supposed lien, arising from sundry dealings between her testator and Jarvis, the original owner of the certificates ; and the case stands on the extent of this lien.
Courts, in modern times, have leaned much in favor of liens, considering them as founded on the principles of natural justice, and as tending to the security and encouragement of commerce. But hitherto the adjudged cases have not transcended the limits of equity and sound policy; and within those limits it is the duty of courts, in all cases, to confine themselves.
Liens generally arise either from express contracts, or from the usages and customs of trade, or from the manner of dealing between the parties. In this case, there is no lien, by express contract, beyond the note for 500 dollars; and as to that sum, the tender to the defendant, for the benefit of Russell’s estate, operates .as a full discharge. No agreement, constituting a lien, can be inferred from the manner of dealing between Jarvis and Russell, nor from any usages of trade. There is no usage of trade appli *355 cable to the transactions between the parties ; and it is clear, from the evidence, that the notes given to Jeffrey fy Russell, which after-wards came into the possession of the bank, were never intended to be secured by the deposit of the certificates, but by a conveyance of real estate.
* This conveyance was made in 1800, nearly two years before the certificates came to the hands of Russell, and was then deemed ample security. The conveyance being absolute, it may be doubted whether the grantees would not be held to account for the value of the land at the time of the grant, or at the end of the four years, within which time Jarvis had a right to redeem or repurchase the land, by payment of the notes.
But, be this as it may, it is certain that the parties never looked to the certificates, for security of the notes transferred to the bank. For it appears by a paper produced by Otis, in the trial of his action, that it was agreed by the parties that the certificates should be given up, on the payment of the note for 500 dollars. This agreement must be considered as limiting Russell’s claim on the deposit, and negatives any implied agreement, between the parties, that the certificates should remain as security for the other notes. The parties were competent to agree upon the extent of the lien upon the deposit; and as they did limit that extent by an express agreement, it is not easy to perceive on what ground it is that this lien can be extended.
The principle, that a lien cannot be extended beyond the plain meaning and intention of the parties, seems to be well settled in the case of Green & Al. vs. Farmer & Al. 4 Burr. 2214. That was a case of certain dyers, who set up a lien on certain goods by them dyed, and insisted on the right to retain them until they were paid, not only for dyeing the goods in dispute, but also for other goods dyed and returned at a prior time. But the court held that the lien could not be thus extended; on the ground, that it was to be inferred, from the manner of dealing between the parties, that the dyers relied on the personal credit of their employers. The same principle is recognized in the case of Walker & Al. vs. Birch & Al. 6 D. & E. 258, and in that of Rushforth & Al. vs. Hadfield & Al. 7 East, 224. In the case of Walker & Al. vs. Birch & Al., it was said that the lien which a factor has on the goods of his principal, for his * general balance of accounts, arises upon an agreement which the law implies; that such lien, therefore, may be controlled by an express stipulation; and that where goods are deposited for a particular purpose, they are not subject to the general rule respecting liens. Russell, therefore, if considered as a factor, had no lien to the extent contended for. *356 nor could such a lien be supported, if the express stipulation were laid aside.
Before the case of Kruger & Al. vs. Wilcocks & Al., (2) it was doubted whether a factor had a lien on the property of his principal, coming to his hands, for his general balance. The law, however, is now well settled that he has. But this lien is confined to his general account as factor, and does not extend to debts contracted previous to his agency.—Houghton vs. Matthews. (3) — Now, it is clear that Russell was not the general factor of Jarvis. The only transaction, in which he can be considered as acting in the charicter of factor, took place in April, 1802, long after the notes to Jeffrey &f Russell had been given. Those notes, therefore, could not constitute a lien on the certificates, by the general rule of liens n respect to factors.
But, whatever lien Russell had, considered as a factor, it was ex «uigivshed by his breach of trust, in tortiously pawning the certificates, id secure a debt of his own, without notice that he acted as fiictor, tine' of the lien he claimed. For it is clearly settled in all the books, mat a factor has no right to pledge the property of his principal; nor can such tortious pledging preclude the principal from recovening >_ of the pawnee, without any tender of the sum for which it was pawned. (4) (a)
In the case oí Neusotn vs. Thornton, the court went so far as to say that even the endorsement of a bill of lading would not give validity to such a pledge. In the case of Daubigny fy Al. vs. Duval & Al., (5) an attempt was made by counsel to qualify the general position, that a lien is a personal right, and cannot be transferred to another, by insisting that a person would lose his lien only by parting with * the possession to the owner. But the court would not allow the rule to be thus qualified ; and Judge Duller pointedly observes that the qualification attempted to be ingrafted on the rule, would destroy the rule itself. A similar doctrine he lays down, in his masteily opinion delivered before the House of Lords, in the case of Lickbarrow vs. Mason, (6) that “liens at law exist only in cases where the j'arty entitled to them has the possession of the goods ; and if he once part with the possession after the lien attaches, the lien is gone.” There is not, therefore, in my opinion, the slightest ground of defence, in this *357 case, on the principles of law applicable to liens, if Russell is to be considered in the character of a factor.
Nor is his title better as pawnee. It has been argued that a pawnee has a right to retain the pledge, not only as security for the money lent upon it, but also for any other debt which may be due to him; and this argument has been supposed to derive support from the principles of the civil law. It is true that some passages ;n the books seem to countenance such an argument; but those passages, I think, may be understood to apply only to debts con tracted after the pawnee’s possession of the pawn. Such debts may be presumed to have been contracted on the credit of the pawn.
If, however, the principle of the Roman law cannot be thus qualified, it is enough to say that it is opposed to the principles of the common law; and, as it seems to me, to the plain principles of justice and fair dealing. For, if a debtor obtain of his creditor a loan of money on pledge, upon an express agreement that the pledge shall be restored on the repayment of the loan, the creditor cannot retain the pledge, as security for a prior debt, without violating the principles of good faith.
Parties having a legal capacity to contract have a right to make such stipulations between themselves as they see fit, provided they do not contravene the law; and such stipulations are to be faithfully observed by the contracting * parties. The law, in such case, will never make any new contract by implication. Now, I consider the agreement between Jarvis and Russell to have been proved by indisputable evidence. It was an agreement, on the part of Jarvis, to pay the note for 500 dollars on the delivery of the certificates; and on the part of Russell, to deliver the certificates on payment of the note. They could have no intention that these certificates were to be retained as security for the notes payable at the bank ; for such a supposition is repugnant to the terms of the agreement.
But it has been argued, that Russell’s executrix is entitled to the possession of the certificates on equitable grounds; that their value may be set off against the debt due from the estate of Jarvis. I feel, however, constrained to say that, to my mind, there is neither equity nor law in such a claim. If the executrix has no legal lien on the certificates, it seems to me strange to say that she is entitled to possession.. What claim of preference have the heirs of Russell, or his executrix, over the other creditors of Jarvis ? By the policy of the statute for the distribution of insolvent estates, (7) all the *358 creditors are placed on a footing of equality. A claim of preference, therefore, by one creditor over another, ought to be regulated by the strictest principles of law.
Furthermore, if the executrix of Russell should obtain possession of the certificates, their value could not be set off against a debt due to her, as executrix, from the estate of Jarvis. The statutes for setting off mutual debts against each other are not applicable to goods, or other specific property, wrongfully detained. There can be no set-off in trover unless the defendant has a lien on the goods. (8) Besides, an action of trover would not lie against the executrix, for a conversion by her testator. And in an action against the executrix, for a conversion by her, or in an action against Otis, it cannot be contended that they could set off a debt due to the testator.
* In regard to the damages, the defendant has, I think, a lien on the certificates, for the amount of his demand against the estate of Russell; which sum has been tendered by the plaintiff, and ought therefore to have been deducted from the estimated value of the certificates. From the evidence, also, Jarvis’s original title to the full amount of the certificates seems doubtful. A new trial, therefore, in my opinion, ought to be granted; unless the parties shall be able to agree on the amount of damages.
Putnam, J.
A recurrence to the facts, in the order of time in which they took place, will have a tendency to ascertain the rights of the parties. As early as the year 1800, it appears that Russell held Jarvis’s notes to Greenleaf, endorsed for the use of Jeffrey, Russell, and Jones, amounting to 22,000 dollars. That company, being indebted to the Union Bank, placed those notes there; and in December, 1800, Jarvis, at their request, made a conveyance to the bank of some land in the District of Maine — which, although absolute in form, was intended as collateral security for those notes. Nineteen years ago, then, it appears that Jarvis was greatly indebted to Russell; and it must be recollected that the debt has never been paid. In April, 1802, Jarvis furnished Russell with money to redeem the scrip for 130,000 acres of Georgia land, which Jarvis had pledged to Murdoch. That property was negotiable, and transferable by delivery, as the paper had been endorsed in blank by Jarvis. It was suffered to remain in Russell’s hands, as B. Jarvis testified, only for safe keeping. But it must not be forgotten, however, that Russell was then the holder of the Greenleaf notes; and that circumstance might have been some inducement to the original deposit of the scrip in the hands of Russell. It does not appear, in leed *359 that any contract was made by them, originally, that the scrip should be held as a security for those notes; but that was the lawful advantage arising to Russell from the deposit. For if Jarvis had sued Russell for the scrip, Russell could have sued Jarvis for the payment of the Greenleaf notes ; * and it was not material that one claim could not be set off, in form, against the other; as the executions might have been contemporaneously enforced by one party against the other.
To every legal as well as equitable purpose, Russell might have availed himself of the scrip, as a security for the Greenleaf notes. We have seen that Jarvis could not have prevented it, if he should have desired so to do. Nor could his creditors have been in a better situation. If they had sued Russell as the trustee of Jarvis, the court would not have compelled Russell to have delivered the scrip, without payment of the notes. Why should the administrator of Jarvis be permitted to- litigate more advantageously ? (a)
But to proceed in the order of events: In 1802, Jarvis received of Russell 500 dollars, to be repaid on receiving the scrip. This appears from Jarvis’s receipt of October 23, 1802. It appears that Jarvis never has paid the Greenleaf notes, nor the 500 dollars; that Russell, embarrassed probably by the failure of Jarvis to fulfil his engagements, pledged the scrip to the defendant in November, 1810, for 1000 dollars. The scrip was delivered to the defendant endorsed; so that, by operation of law, the legal right or power over the property vested in the defendant, Rogers. He became accountable to Russell to reconvey it, when the 1000 dollars should be paid, with interest. That was a contract, however, with which Jarvis had no privity; for Rogers then had the legal title to the scrip; and there is no suggestion that the transfer of Russell to Rogers was not fair, or that Rogers had any knowledge that Jarvis had any claim whatsoever upon Russell for a redelivery.
Thus the matter remained until after the death of Russell. Then his executrix, as she lawfully might, offered to pay Rogers the money which was due from her deceased husband ; and she did, in effect, pay it, by the note of her agent Otis. If the money had been paid by Otis, instead * of his giving a note for the amount, and thereupon the scrip had been delivered for the use of the executrix, is it not manifest that the property would have passed or lodged where Jarvis originally intended that it should, viz., in the hands of Russell, or of his representative? Rogers would have been out of the controversy, and Jarvis would have *360 been compelled to perform his engagements to the estate of Russell before he could have repossessed himself of the scrip. Now, the transaction which did, in fact, take place between the agent of the executrix of Russell and the defendant Rogers, admitting his solvency, (which no one doubts,) gave to the estate of Russell the beneficial interest in the scrip. For the defendant has rendered himself accountable, upon his contract with the agent, to transfer it upon the payment of 'his note. Why, then, should the administrator of Jarvis be permitted to defeat so just an arrangement?
It has been contended by the plaintiff that the conveyance of the land in Maine was a payment of the Greenleaf notes, so that Jarvis owed no debt on that account; that Jarvis never had any right of redemption ; and that it could not be construed a mortgage. It was, in fact, an absolute grant, and not a deed with defeasance. The consideration, or rather the value of the land, was secured to Jarvis by means of the bond of Jeffrey, Russell, and Jones. If Jarvis should pay the Greenleaf notes in four years, they undertook that the bank should reconvey to Jarvis. If not, then, by the operation of law, the value, to be ascertained upon a sale, should be applied towards the payment of the notes. Unfortunately, after the trial was had, the land proved insufficient to pay the notes. The intent of the parties, as indicated by the deed and the bond, and especially by the letter of Jarvis of July, 1804, manifestly was, that the land should be a security, and not a payment of the Greenleaf notes. And although technically it was not a mortgage, yet Jarvis had, by the bond of Jeffrey, Russell, and Jones, a convenient time for the redemption. The * net price for which the land sold is to be credited to Jarvis, towards the payment of the Greenleaf notes. For the balance, the estate is still indebted.
Then it is said chat Russell was only the bailee for safe keeping, nr at most pawnee; and that a bailee or pawnee cannot, by law, assign the property deposited or pledged. For this position we are referred to the case of Sir John Hartop vs. Alderman Hoar & Al. Sir. 1187. This case is much better reported in 3 Atk. 44. The case was thus: The plaintiff deposited a pair of diamond ear-rings, and other jewels, with one Seamer, for safe keeping, sealed up in a bag with the plaintiff’s seal. Seamer broke open the bag, and pawned the jewels to the defendants, for a debt due from him to them. It was held that the plaintiff should recover; for Seamer had not any property, general or special, in the jewels. He came to the possession of them by trespass, or by felony ; and the right of the plaintiff was not devested, as it would have been by a bond fde purchase of the defendants in their shop in London, which war *361 an open market — the court considering that the custom extended only to sales, and not to pawns made there.
But there is a great difference between this case and the case at bar. Neither the title nor the possession of the jewels was conveyed to Seamer. They were as goods in a chest locked up, whereof the owner kept the key. But the scrip, in the case before us, was transferable by delivery, like a negotiable note or bill of exchange endorsed, or like a bill payable to bearer. The title was vested in Russell, and he had a legal power to transfer it, being accountable only to Jarvis.
The case of Collins vs. Martin & Al. (9) is very strong to this point. There, Collins had deposited a bill of exchange, endorsed in blank, with one Nightingale, a banker, for collection. Nightingale pledged the bill, to raise money for himself, and became bankrupt. Martin fy Al. took it fairly in the course of their business, and they were adjudged to be the lawful owners of the property. In this case, there * was a breach of trust by the party to whom the plaintiff delivered the bill. But the sound rule of law was applied, that, where one of two innocent parties must suffer by the fraud of a third person, the loss ought to fall on him who reposed confidence. In the case at bar, the confidence was placed in Russell by Jarvis; and if it was abused, the loss should fall on Jarvis, and not on an innocent holder.
It is not perceived, however, that Russell had any ill intent when he pledged this property. He was probably reduced to that necessity by the neglect of Jarvis to fulfil his engagement; and although he transferred the legal title to the defendant, his obvious meaning was, to hold a power over the stock, which would procure a reconveyance or an equivalent. For that he relied upon the contract of the defendant,.to the end that, upon an adjustment of their mutual claims, he, Russell, should be in a situation to account with Jarvis for the property deposited. If the defendant had misappropriated the scrip, or had been unable to pay for it, Russell would have sustained the loss. It appears, however, that Rogers has been able, and is willing, to do what he ought, as soon as that can be judicially made known.
This action supposes that the stock belonged to Jarvis at his decease. But it has been already observed that the legal title was transferred by him to Russell. It has not been reconveyed, unless by the operation of the law, arising from the transaction between Russell and Rogers. Can the contract of Rogers to reconvey estate to Russell, or to Otis, be considered as revesting- the- title in Jarvis *362 or his assigns? That could not have been originally intended by Russell; for the name of Jarvis is not mentioned in that contract.
If the plaintiff should recover in this action, the defendant must be excused from performing his contraer with Otis; for no one will contend that he is to answer to both. That contract must be considered as vacated; or, by some sort of fiction or commutation, as enuring to the use of those who were neither parties nor privies to it. The judgment * would be against the defendant, and could not be met by any just demands which the estate of Russell may have against the estate of Jarvis. Those must be satisfied with a decree of distribution under a commission of insolvency. And yet it must be obvious that the representatives of those estates are the parties in interest. The defendant is a mere stakeholder.
But if the plaintiff is not permitted to interfere in the arrangements which have been made between. Russell and the defendant, the property will be restored ; and the mutual claims of the estates of Russell and Jarvis will be settled according to the legal results arising out of the original trust or deposit. When those gentlemen were living, no attempt was made to frustrate such an appropriation of the property. Can it be supposed that Russell would have suffered his demands against Jarvis to have slumbered for ten years, if he had not believed that he was secure, in virtue of this deposit ? —■ or that Jarvis would not have enforced his claim to the property, if he could fairly have done it without first satisfying Russell’s claims against him ?
Upon the whole matter, my opinion is, that the title to this stock was transferred by Jarvis to Russell, and by the latter to the defendant, Rogers; that it has not been revested in Ja"vis; and that the verdict, which was for the plaintiff, ought to be set aside, and the plaintiff become nonsuit.
And in the case of Otis vs. Rogers, my opinion is, that the de fendant was by law obliged to transfer the stock, according to his contract; and that judgment, in that case, should be entered according to the verdict.
Jackson, J.
I agree with my brother Wilde as to the two objections which he has mentioned to the verdict; first, that the jury ought to have deducted the amount of the debt due to the defendant, which the plaintiff had tendered him; and secondly, ■that the quantity of the land, comprised in the certificates, which ¡belonged to Mr. Jarvis, is left so uncertain upon the evidence that there ought to be a new trial, to ascertain the quantity. This question does * not appear to have been considered *363 by the jury, and seems to have escaped the notice of the counsel, on the former trial.
But, independently of these grounds, I have come to the conclusion that the verdict ought to be set aside, and that the plaintiff is not entitled to recover any thing in this action.
The defendant has no interest in this question, excepting, perhaps, to the amount of the bill of costs. He is ready to deliver the certificates either to the plaintiff Jarvis, or to Otis, the plaintiff in the other action, as the Court shall award, upon receiving the debt due to him; and each of those other parties admits his right to that extent. This is, therefore, a question between Jarvis and Otis; and we are now to decide which of them is entitled to the possession of these certificates. I consider it in the same light as if Sara/ Russell, the executrix, were a party in that other action, instead of Otis; because it is stated that Otis was her agent, and redeemed the stock, originally, at her request; and also because this view of the case is most favorable to Jarvis. If Otis is not her agent, he must be considered as the assignee, or purchaser, for a valuable consideration; and, considering the nature of the certificates, which were transferable by delivery after the endorsement, the title of Otis, as a purchaser, would be superior to that of Jarvis — unless it could be shown that he was informed, at the time of his purchase, of the rights of Jarvis, and of the defeasible title of Russell.
Considering it, then, as a dispute between the representatives of Jarvis and the representatives of Russell, it is obvious that neither party would have much interest in the question, if both of the estates were solvent. But as the estate of Jarvis is deeply insolvent, and as the executrix of Russell has large claims against Jarvis’s estate, she is desirous to hold these certificates, to be used by way of set-off, in order to prevent or diminish the loss which she would otherwise sustain by reason of that insolvency. It appears to me reasonable and just that these mutual demands * should thus compensate each other, if it can be effected without violating the rules of law.
Admitting that Russell, when he agreed to hold these certificates as a security or pledge, did not stipulate, nor expect, that they should be held for any thing more than the 500 dollars, yet it is reasonable to suppose that, when his security for the other larger sum was found to be insufficient, he looked to this as a fund out of which he might indemnify himself; and that, relying on this, he took no other measures, whilst he and Jarvis were living, to secure himself from loss on account of that large debt. And whether he so considered it or not, these certificates might have been applied 1o the discharge of that debt, if the matter had been settled in the *364 lifetime of the parties. If Jarvis, while living, had tendered to Russell the 500 dollars, and demanded the certificates, the latter might have refused to deliver them until his other debt was also paid. It is true that, upon such a refusal, he would have been liab e, in an action of trover, to account for the full value, deducting only the 500 dollars. But he could, at the same time, have recovered against Jarvis the amount due on the other notes; and the executions on these two judgments might have been mutually set off in the hands of the officer, and the balance only would have been received or paid by Jarvis.
This mode of set-off was provided by the provincial act of 6 Geo. 3, c. 2, and the same provision is introduced in the late statute of 1810, c. 84. Our law pays no regard, in this case, to the origin or nature of the demands. Whether they arise ex malefició or ex contractu, they are reduced to the same level by the respective judgments, and will mutually compensate each other. This certainly approaches nearer to the principles of natural equity than the common-law rule, which refuses to allow a set-off in any case ; or even the more liberal provision of the English statutes on this subject Our statute, before referred to, carries this equitable • principle as far as it was carried by the civil law; * and in some cases, perhaps, further than the rule ofcompen sation, strictly so called, was carried by the Roman code; for by that code there were some cases, as of a deposit, where good faith required the restoration of the specific thing deposited, without deduction on account of any cross demand. (10) Possibly, even in some of those cases, the same result might be effected by way of retention. (11) But, however that might be, there never was any doubt in the case of a pledge ; and the pawnee might always retain it, not only for the sum for which it was specifically pledged, but f >r all other moneys due to him on any account whatever. (12)
Thus stood the rights of the parties whilst they were both living. When Jarvis died insolvent, the equitable right of Russell to set off these mutual demands became still stronger. Every claim, on both sides, that could by law survive for or against the estate of a person deceased, was then to be brought into an account current, and the balance, only, was due from one to the other. This was decided in the case of M’Donald vs. Webster. (13) The maxim of the civil law is, Frustra jpetis, quad max es restiturus. I should *365 say injusté petis, when you owe an equal sum, which yet by the course of law you cannot be compelled to restore. This would be the case, if the administrator of an insolvent estate could recover his whole demand, and leave his debtor to recover back a small dividend only, upon what might be due to him from that same estate.
As Russell thus had, at one time, the right, and the power, to retain these certificates until all his just demands against Jarvis were satisfied, the next question is, whether he afterwards relinquished, or in any manner lost, that right. It is clear that he never intentionally relinquished it; he never restored the certificates, nor agreed to restore them, to Jarvis, nor to his administrator. If, then, he lost his right to hold the certificates, it must have been the necessary legal consequence of some event not under his control, or of some act of his which was not intended to have that effect.
* The death of Russell certainly produced no change in this respect. His executrix liad the same rights, so far as Jarvis was concerned, that Russell himself had when living. The only other fact, from which such a consequence could be deduced, is the transfer of the certificates made by Russell to Rogers, the present defendant; and it was argued that, by thus parting with the possession, he lost his lien, and his legal property in the goods, in like manner as a factor is said to lose his lien by pledging the goods for his own debt. This rule, as to factors, is taken from the law merchant, by which the factor is considered as merely the attorney of his principal; and upon that ground the case of Kinder Of & Al. vs. Shaw & Al. was decided in this Court. (14) But, in the case of goods which are pawned or mortgaged, the pawnee or mortgagee has a special property in them. (15) (a)
In the case of Ratcliffe vs. Davis, the pawnee had delivered the goods to a stranger for safe keeping, and it was not pretended that his lien was thereby destroyed ; and the pawnee having died, a tender was made to his executrix, and thereupon an action of trover was maintained against the bailee or depositary. In More vs. Con-ham, it was decided that the pawnee has an interest and special property in the pawn, which he may assign over; and if the assignee detains it, after payment by the owner, he is liable to an action of detinue. In Demainbray vs. Metcalfe & Al., (16) the *366 plaintiff had pawned some jewels to the defendant Knight for £110, to be redeemed in twelve months; and Knight, in two days after-wards, pawned them to the defendant Metcalfe for £200. The plaintiff was not allowed to redeem, without paying all that had been loaned by Metcalfe.
From these cases, it appears that the pawnee may deliver the goods to a stranger without consideration, or he may sell and assign all his interest absolutely, or he may assign it conditionally by way of pawn, — without, in either case, destroying the original lien, or giving to the owner a right to reclaim them on any other or better terms than he could * have done before such delivery or assignment. And this is also the rule of the civil law. (17) It appears, therefore, that all the right and interest which Russell ever had in the certificates in question remained, as between him and Jarvis, unimpaired by the assignment made by Russell to Rogers; and this was the state of things when Russell died.
After his death, his executrix, by her agent, redeemed the certificates from the hands of Rogers, he making no objection to it; and they were then pledged to him again, with a new note, for the same sum. The executrix, after the redemption, still remained the pawnee of Jarvis, if he was then living, and held the certificates upon the same terms on which her testator had held them. Of course, her subsequent pawning of the certificates to Rogers did not divest her lien or property in them. When, therefore, she caused the tender to be made to Rogers in November, 1815, her right to the certificates, or that of her agent, Otis, became absolute and perfect. It was decided, in the case of Ratcliffe vs. Davis, before cited, that, on the tender by the pawner, the property of the goods pawned was instantly revested in him. The lien of the pawnee is, ipso facto, discharged by the tender. Rogers ought, then, to have delivered the certificates to Otis, and he would have been protected against any claim of Jarvis. The latter made no tender until four months afterwards ; and it could not be known in November, 1815, whether he would ever make any tender. At that time there was a perfect right in Otis to demand and receive the certificates, and a perfect obligation on the part of Rogers to deliver them to him. Upon this right the action of Otis was founded ; and it appears to me that an action so commenced cannot be barred by the subsequent transactions between Jarvis and Rogers. Is, qui actionem, habet ad rem recuperandam, ipsam rem habere videlur. (18) If Rogers hid deliv *367 ered the certificates to Otis upon that demand, this action by Jarvis could not have been maintained ; and it is a sound maxim of law, that it shall not be in the power of any man, by his election or his * voluntary act, to vary the rights of two contending parties. I consider the refusal of Rogers to redeliver the certificates to Otis as a voluntary act; because he might lawfully and safely have delivered them, and it was his duty so to do. His refusal, therefore, ought not to prejudice Otis. It is true that Rogers has acted with honesty and fairness in the transaction ; and he seems to have been, at all times, ready to deliver the certificates, as soon as he could be informed authoritatively to which party they belonged. But the motives of his conduct have nothing to do with its effects on the other parties. It is the same thing to Otis, whether Rogers was influenced, in refusing to deliver the certificates to him in November, 1815, by mere caprice, or by collusion with Jarvis, or by an honest doubt as to his duty in that respect. His ignorance, or mistake, of the law, ought not to prejudice Otis.
Upon these grounds, I am satisfied that Otis ought to recover in his aclion against Rogers; and that Jarvis ought not to recover. If that should be the judgment of the Court, Mrs. Russell, the executrix, will receive the certificates; and Jarvis may then, in an action against her, recover the value of them, deducting whatever the estate which he represents may owe to the estate of Russell — according to the principle recognized in the case before cited of M’Donald vs. Webster.
I began with stating my opinion, that it was just and reasonable that the executrix of Russell’s will should have these certificates, to account for them to Jarvis, the administrator ; so that she might set off her demands, as executrix, against the estate of Jarvis. But that is not the ground on which I place her title to the certificates. I have endeavored to show that Otis, her agent, had an indisputable legal title to the certificates, when he commenced his action against Rogers; and that nothing has since occurred to divest or alter that right. This legal title in Otis is so satisfactorily proved to my mind, that I could not resist it, although I might regret the consequences, if my opinion, as to the equity of the case, were the reverse of what it is.
* Another question has presented itself in this case; which is, whether the right of redeeming these certificates survived to the administrator of Jarvis. If the contract between Russell and Jarvis had been that of a simple pawn, this question would have been very material, and in my mind decisive in the case. But it was not a mere pawn. Jarvis gave his note to Russell for the 500 dollars lent to him, which he promised to repay *368 on receiving the certificates. It was, therefore, in the power of Russell to demand his money at any time, on offering to deliver the certificates; and the latter were held only by way of mortgage, or collateral security for the note. Considering it in this light, there could not be a forfeiture of the certificates, until a demand by Russell of payment of the 500 dollars. As no such demand has been made, the right which Jarvis had to reclaim the certificates remains to his administrator. On this ground, therefore, if there had been no other question in the case, my opinion would have been for the plaintiff. But for the reasons before given, I think that neither Jarvis nor his administrator could recover against the present defendant.
Thatcher, J.,
observed that this case was fully considered at a conference of all the judges at the last March term, in their chambers, and that it had lain in his mind that the opinion of a majority the Court was to be delivered by the chief justice at the law term for the southern circuit, in the succeeding July. Since his arrival in town, at the commencement of the present term, he had learned that judgment in the action was not yet entered, and that his brethren proposed to deliver their respective opinions, with the reasoning on which those opinions had been formed. The cause had not been the subject of consideration with his honor since the last term in this place ; and, since his arrival here, his time had been fully occupied by the current business of the Court. He should now, therefore, only say that, having read the minutes of the opinion prepared by the chief justice, and now to be delivered, he fully * concurred in its result, that the plaintiff was entitled to judgment.
Parker, C. J.
The rights of three parties are in question before the Court, in the case now under consideration.
The administrator of the estate of Leonard Jarvis is one party . Joseph Otis, or rather Mrs. Russell, as she is executrix of the last will of Joseph Russell, is another; and Mr. Rogers, the defendant, is the third. The two former are making adverse claims upon the defendant, for the value of the property in his hands; each of them having tendered to him the amount of the debt and interest, as a security for which he has claimed to hold the property; and neither of them can recover of him without deducting, from the value, that amount; so that he may be considered as having no interest in the decision, and as being a mere stakeholder. For, whichever of the two contending parties recovers, the other must necessarily fail in his suit; unless it appears that part of the property in the defendant’s hands belongs to one, and part to the other, in which case he may be accountable to both, according to their respective interests *369 We are, then, to consider the claims of the two estates of Jarvis and of Russell to the property which is the subject of the suit.
And, first, it is admitted, or, if not admitted, cannot well be denied, that the property was originally in Leonard Jarvis. It consists of what has been commonly called Georgia scrip, being certificates of ownership of Georgia land. It was issued in the name of Leonard Jarvis, and it is not disputed that it originally belonged to him. If Russell, therefore, had any property, it must be derived from Jarvis. It was found in the possession of Russell, with the name of Jarvis endorsed in blank upon each certificate. Now, as this paper was made transferable, by a vote of the company by whose authority it was issued, of which Jarvis was one, and he having assented to the vote, and having endorsed his name in conformity to this vote, the possession by Russell, under such circumstances, is prima facie evidence of property in him.
*But this evidence is fully rebutted by the testimony of Benjamin Jarvis, which is wholly uncontradicted ; and by this testimony it appears that Russell received the scrip, without having paid any thing for it, or pretending to claim it as his own; having acted as the friend and agent of Jarvis, in redeeming it from the hands of one Murdoch, to whom it had been pledged by Jarvis, and who also furnished the funds by which it was redeemed. Russell, therefore, acquired no title to the property by this act, but became the depositary for safe keeping, having no right to dispose of it, or to use it for any purpose of his own. This transaction took place in April, 1802; and is to be accounted for from the circumstance, that Jarvis at that time lived in a remote part of the state, and that the property was then of no actual value, although considerable expectations were indulged of a future value.
At the trial these facts were not disputed; but the representative of Russell claimed a right to have possession of the property on the ground of a lien supposed to exist, in relation to a large debt alleged to be due from the estate of Jarvis to that of Russell. The facts respecting this claim appear, from the report, to be as follows: —. Before the scrip came into the hands of Russell, viz., in 1800, Jarvis had given his negotiable promissory notes, to a large amount, to one James Greenleaf; probably for the consideration of the Georgia land which he had purchased. Greenleaf, being indebted to the Union Bank, and having Russell, Patrick Jeffrey, and John C. Jones, for his sureties, to secure them, endorsed Jarvis’s notes ; and Jarvis, to secure the bank, conveyed to it a township of land in the District of Maine. This conveyance was absolute in form; but the land being supposed to be of more value than the sum due, Russell, Jeffrey, and Jones, gave Jarvis a bond, the condition of which was, *370 that if lie paid the sum due to the bank in four years, the land should be reconveyed to him. The debt was not paid by Jarvis. and the land was, long after the expiration of the four years, sold by the bank for a sum much less *than the debt, and the proceeds credited to Russell, Jeffrey, and Jones.
It was contended that Russell had a right to hold the certificates, as a security for the debt of Jarvis; and this was all the foundation upon which the right was said to depend, when the action was tried. I was of opinion that this constituted no lien ; for I thought a lien upon the property of another could be created only by some contract, express or implied; unless in the few instances where it is created, by law, in favor of some particular branches of business. I saw in the facts proved no evidence of such contract; but, on the contrary, much to disprove it. For these certificates were not placed in the hands of Russell, to secure the debt.. On the contrary, they did not come into his hands until more than a year after the debt existed; and he received them merely for safe keeping for Jarvis. Besides, another security, thought to be adequate at the time, was taken, which was all that was relied upon; and no intimation appears to have been made, either by Russell or Jarvis, in the correspondence which took place between them, of any design, entertained by either, that these certificates were to be looked to as security.
I remain still of the same opinion; for I have neither heard nor seen any judicial decision tending to prove that, if a creditor accidentally gets possession of his debtor’s goods, or if his debtor commits them to him on a particular trust or confidence, the creditor has a right to retain them as security for his debt, (a) On the contrary, I apprehend any other creditor may attach them, if they can be seized by an officer.; or the creditor may be charged as trustee, if they cannot be come at to be attached. Not so, if they were placed in his hands as a pledge, or security for the debt; or if the debtor afterwards assent that they be detained for that purpose.
I admit that, by the principles of the civil law, as they have been applied to mortgages, if the debtor pledges property for the security of a debt, and afterwards another debt * is contracted to the same party, the creditor may retain until both debts are paid ; provided no other security is given, and no stipulation is made, with respect to the second debt, tending to *371 negative the presumption of an implied contract that the pledge should be so retained. But this doctrine, I believe, is founded upon the presumption of such contract; and where there is no original contract to pledge, there can be no presumption with respect to a subsequent debt.
Suppose my creditor, to whom I have given security, believed to be satisfactory, borrows of me bank stock for the purpose of raising money ; shall he withhold this from me, until I pay him the debt ? Certainly not. He cannot, without my consent, appropriate it to his own use, or refuse to restore it to me. It is true, if I am obliged to sue him for his breach of contract, and he sues me for the debt, our executions may, according to statute, be set off against each other. But this is a statute remedy, and can exist only in the case provided for by the statute ; and it is reasonable that, when both demands are reduced to a level by judgment for money, one should go to pay the other. But it is not reasonable that my creditor should hold my property, or sell it, when I might prefer to keep it in specie, without any agreement with me to that effect. And I should conceive that the right of action in me, under such circumstances, proved that he had acquired no right to the property, by reason of my being his debtor.
Nor can any argument, in favor of such claim, be derived from our statute for the distribution of insolvent estates. For the demands, to be set off under the equitable construction of that statute, must be mutual; and when the creditor’s demand is for money, and the debtor’s estate is liable for a specific article, there is no mutuality ; and no mode is provided by statute, or can be easily devised, for the adjustment of claims of such different characters. If the administrator of an insolvent estate should claim a horse, or any other chattel, as belonging to the estate of the * deceased, as having been lent to the party called upon, or put into his stable or warehouse for safe keeping, the person could not set up his debt, in answer to such a claim. In the case of mutual demands for money due upon account, or otherwise, neither is, in equity or fact, the creditor for more than the balance due; for it may always be supposed that the advances, on either side, are made with a view to the subsisting accounts. But no such inference can be drawn in favor of a creditor who has got possession of specific property of his debtor, without any reference to his debt.
I hold it, therefore, to be clear that, if Russell were now alive, having possession of these certificates, without any claim to hold them except what he would derive from the debt of Jarvis, existing before they came into his hands, the administrator of Jarvis’s estate, *372 although insolvent, would recover the full value of those certificates; and Russell could get nothing for his debt beyond his dividend in common with the other creditors. Neither is there any injustice in this; because, on the principles assumed, no credit was given to the property in his hands, and he would have no more equitable claim upon it than other creditors.
If this reasoning is correct, then the verdict in this case of Jarvis vs. Rogers was right; for, the property in the certificates remaining Jarvis’s, his administrator had done enough to entitle himself to the possession of them ; having tendered sufficient to satisfy Rogers’s demand against Russell.
But the motion for a new trial rests upon another ground; which is that, since the trial of the action, a paper has been found in the possession of Russell’s executrix, signed by Jarvis on the 29th of October, 1802, purporting to be a receipt for 500 dollars, and a promise to pay that sum when the certificates should be returned to him.
It may be proper to remark here, in relation to the former point, that it is hardly conceivable that Russell should have imagined that he had a right to hold the certificates for the former debt, or that he should have even * intended so to do, and yet have given no information of such intent, when this paper was signed. For, although it contains no promise, on the part of Russell, to return the certificates on the payment of the 500 dollars, yet such is the clear implication.
However this may be, it is not doubted that, from this time, Russell had, by consent of Jarvis, a lien upon the certificates, to secure the sum so borrowed. It is admitted, also, that he had a right to assign the pledge thus obtained, to the extent of his legal interest in it; and, considering the nature of the property pledged, it bearing, on the face of it, an assignable quality, it is admitted that Rogers, by Russell’s assignment to him, had a lawful lien for all which he advanced to Russell upon the credit of it. So that, in 1810, when Rogers received the certificates in pledge for 1000 dollars lent by him to Russell, he being ignorant of Jarvis’s property, and having reason to believe it had been transferred to Russell, he had a right to retain against Jarvis to the full amount of his debt. This has been settled in the former action between the plaintiff and Rogers, and is conformable to principles established in various decisions.
But it does not follow that Russell had acquired new rights over the property, or that Jarvis had, by this transaction, lost his rights. For, between these two parties, the assignment by Russell to Rogers for more than the amount for which the certificates had been pledged to him, was a breach of trust; the effect of which was not to in *373 crease Russell’s rights, although, under the circumstances, Rogers acquired a more extended right over the property than Rue-sell had.
I apprehend it to be clear that Jarvis, by tendering the 500 dollars and interest to Russell, and the debt due to Rogers, might have entitled himself to a delivery of the certificates from Rogers; because Russell had exceeded his authority, in pledging them for a debt beyond that for which they were pledged to him. He had disabled himself from restoring them to the right owner; and this latter acquired *the right to reclaim them, wherever they might be found — paying the sums for which they were legally holden. And having tendered to Rogers the sum due from Russell, which exceeded the sum for which they had been pledged by Jarvis, this is a virtual payment of the sum due from him to Russell.
Nor does it make any difference that Rogers was under contract to deliver them to Otis, upon payment of the note given by Otis and Jeffrey after the death of Russell. For this was a mere continuation of the first pledge ; it never having been in fact redeemed, but the security only nominally changed. For Otis had no right to pledge them, and, acting for Mrs. Russell, it must be considered that this transaction was only a prolongation of the same contract.
It is said, however, that, before any demand by Jarvis which Rogers was bound to answer, — that is to say, before the money was tendered, — Otis had tendered the sum due from him, and then Rogers was bound, by his contract, to deliver the certificates to him. Be it so ; if he had delivered them, he would have a good defence against Jarvis ; but not having delivered them when this action was brought, and they being at this time in his possession, Jarvis, proving his property, has a right to recover them ; and if he does, Rogers may defend himself against the claim of Otis, because he will have delivered them to the right owner by judgment of law.
Thus I think it is shown that the pledge of 500 dollars does not stand in the way of Jarvis’s claim upon Rogers; and having before attempted to show that an antecedent debt, contracted without any reference to this pledge, cannot be covered by it, I see no reason why the verdict should not stand ; except for such mistakes in the amount, as may be corrected without going to another trial. The amount of Rogers’s debt should be deducted, the ground upon which it was refused at the trial being mistaken. And I think, also, that the value of 20,000 acres of the land should be deducted, or a new trial should be had. For, although certificates * of 150,000 acres are in Rogers’s hands, having all originally belonged to Jarvis, yet as Jarvis stated, in his *374 letter of 1801, that his certificates in the hands of Murdoch were for 130,000 only, there is a presumption that the remaining 20,000 were transferred to Russell unconditionally.

 13 Mass. Rep. 105.

 Ambler, 252.

 3 B. & P. 485.

Strange, 1178, Patterson vs. Tash. — 1 East, 335, Maanss vs. Píen \ <t. — 6 East, 17, Newsom vs. Thornton. — Ibid. 538, M’Combie vs. Davies. (а) Vide Story on Bailments, c. 5, § 324—327.

 D. & E. 604.

б) 6 East, 27, in notis.

 Stat 1784, c. 2.

 4 Burr. 2221, Green & Al. vs. Farmer & Al.

 Hathaway vs. Russell,, 16 Mass. Rep. 473. — Sed vide Allen vs. Maguire, post, 490.

 1 B. & P. 143.

 Cod. 4, 31, 14—34. — 11 Heinec. Elem. Juris., &c. P. 3, § 213.

 Dig 6,1, 48. — Heinec, Elem. Juris., &c. P. 3, § 215, 216.

 Cod. 8, 27. — Heinec. Elem. Juris., &c P. 4, § 46. — Hub. Prac. lec. lib. tit. 6, § 1.

 2 Mass. Rep. 498.

 2 Mass. Rep. 398.

Owen, 123, More vs. Conham. — 1 Buls. 29, Ratcliffe vs. Davis. — Yelv. 178, S. C. — Cro. Jac. 244, S. C. — Noy, 137, S. C. (a) Vide Story on Bailments, c. 5, sec. 327.

 2 Vern. 691, 8. — 1 Eq. Ca. Abr. 324, S. C.

 Cod. 8, 24. 1. — Huv. Pral. Lib. 20, tit. 3, § 3.

 Dig. 50.17. 15.

 Story on Bailments, c. 5, sec. 304, 305 — Green vs. Farmer, 4 Burr. 2214. — 6 T. R. 258.—-7 East, R. 224. —15 Mass. Rep. 490, Allen vs. M’Guire. —2 Kent Com. 584. — Prec. Chan. 419 —2 Vern. R. 691